CULPEPPER, Judge.
This is a workmen’s compensation case. Plaintiff had completed a day’s work as a common laborer and was walking toward the exit of the plant when he suddenly became dizzy and fainted. The subsequent diagnosis by medical experts was syncope (fainting) caused by aortic valve stenosis. The district judge found the syncope was job related and caused plaintiff’s present total and permanent disability. Defendant appealed. Plaintiff answered the appeal, seeking penalties and attorney’s fees, which were not awarded by the district judge.
The substantial issue on appeal is whether there was a causal connection between the accident and the disability.
The evidence shows that plaintiff is an uneducated male, 42 years of age, who has worked all of his life as a common laborer. On December 15, 1978, he was using a pick and shovel to dig excavations for concrete slabs. At quitting time, about 3:30 P.M., he put his tools in the shed and was walking toward the plant exit when he suddenly became dizzy and short of breath and blacked out. Co-employees immediately took him to Baton Rouge General Hospital, where he was placed in intensive care and seen by Dr. Boyd E. Helm, a cardiologist of Baton Rouge.
Dr. Helm’s diagnosis was syncope (fainting) caused by aortic valve stenosis. The doctor explained plaintiff had pre-existing aortic valve disease which could have been congenital or could have been caused by such things as rheumatic fever, syphilis or bacterial infections. Over a period of years, calcification of the defective valve progressed causing the valve to become stenosed or constricted. This meant that less and less blood could leave the valve, which is located in the upper left side of the heart. It was Dr. Helm’s opinion that by the day of the accident, December 15, 1978, the valve had become stenosed to the extent that on physical exertion and increased demands on the heart for blood, an insufficient amount of blood could be pumped through the valve. Moreover, some of the blood that did leave the valve may have flowed back into the heart, as it should not do. This meant that an insufficient amount of blood reached plaintiff’s brain, resulting in the symptoms of dizziness and passing out.
Plaintiff remained in the hospital in intensive care from December 15, 1978, to December 19, 1978, during which time Dr. Helm administered the various examinations and tests from which he diagnosed aortic valve stenosis. He recommended plaintiff undergo a catheterization of the heart. In this procedure a tube is inserted through a vessel into the heart and a dye is used to determine the amount of valve disease, the purpose being to determine whether heart surgery is necessary to replace the valve, and also to evaluate his coronary arteries to see whether he needed any bypasses. Dr. Helm testified he explained to plaintiff that on the basis of his diagnosis of aortic valve stenosis, which had progressed to the point of syncope on exertion, the prognosis was that the stenosis would rapidly progress and death would probably occur *545 within five years unless the valve was replaced. Despite this advice, plaintiff never did submit to the catheterization.
When plaintiff left the hospital on December 19, 1978, he agreed to return on December 26, 1978, for the catheterization. However, on this later date he refused to undergo the catheterization. Instead, he returned to his home in Ville Platte, where he saw Dr. Charles E. Fontenot, a general practitioner, in February of 1979, and Dr. Donald Francis Gremillion, an internal medicine specialist of Opelousas, for complaints of dizziness, chest pain, shortness of breath, and weakness. The testimony of these two latter physicians as to their examinations and opinions will be discussed later. Essentially, they made the same diagnosis and prognosis as Dr. Helm.
All three physicians testified the fainting spell on December 15, 1978, was probably causally related to the strenuous physical labor performed by plaintiff that day. Furthermore, all three were of the opinion that plaintiff is now permanently and totally disabled from performing strenuous physical labor. Under this expert medical testimony, defendant concedes that plaintiff suffered a job related accident on December 15, 1978, and that he is presently disabled. However, defendant contends the expert medical testimony of all three of the doctors shows plaintiff suffered pre-existing aortic valve stenosis and that the accident, that is the fainting spell on December 15, 1978, did not cause any physical change in plaintiff’s body which worsened the pre-ex-isting condition.
Defendant concedes that the applicable rule of law is set out in Haughton v. Fireman’s Fund American Insurance Companies, 355 So.2d 927 (La.1978) as follows:
“When there is an accident and a resulting disability without any intervening cause, it is presumed that the accident caused the disability. This simple guide plainly stated in Bertrand v. Coal Operators Casualty Co., 253 La. 1115, 221 So.2d 816 (1969), we affirmed in Johnson v. The Travelers Insurance Co., 284 So.2d 888 (La.1973) and reaffirmed in Gradney v. Vancouver Plywood Co., 299 So.2d 347 (La.1974). The presumption is not irre-buttable, but its effect is to shift the burden of proof to the defendant.”
Also, defendant calls our attention to the following rule stated in the final opinion on rehearing in Bertrand v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816 at page 827 (1969):
“In a case such as the present one, where there is proof of an accident and of a following disability without any intervening cause, it is presumed that the accident caused the disability. The criterion for causal connection between the accident and the disability is: Has the accident changed the plaintiff’s condition so as to render him disabled and unfit for his former employment?”
See also the recent case of Rowland v. Continental Oil Company, Inc., 374 So.2d 734 (La.App. 3rd Cir. 1979) in which we held the presumption established in Bertrand and followed in Haughton is not that the accident was caused by job related activities. The accident must still be proved by a preponderance of the evidence without a presumption. The Bertrand presumption is that where a job related accident is proved, and there is ensuing disability, the disability is presumed to have been caused by the accident, absent an intervening cause. However, we pointed out in Rowland that the Bertrand presumption, reaffirmed in Haughton, is rebuttable.
Applying these rules to the present case, we find a job related accident and disability were proved. Thus, it is presumed the accident caused the disability, there being no evidence of any intervening cause. This shifted the burden of proof to the defendant to rebut the presumption. We conclude that defendant has sustained this burden. The expert medical testimony is unanimous to the effect that plaintiff’s aortic valve disease was not caused nor made worse by his work activities on December 15, 1978.
All three physicians who testified were called as witness for the plaintiff. The *546 principal expert is Dr. Helm, the treating physician and a specialist in cardiology, which field covers the present issues. On the question of whether the aortic valve stenosis was caused by hard physical labor either on or before the day of the accident, Dr. Helm testified:
“Q. All right. The aortic stenosis itself would not have been caused by the hard work. Right, doctor?
A. No, it wouldn’t be.
Q. Is this a symptom in the heart that builds up over a period of time?
A. The aortic stenosis?
Q. Not a symptom, a condition of the heart that builds up over a period of time?
A. Yes. It’s a condition of the heart that builds up over a period of time.”
Also, Dr. Charles Fontenot, the general practitioner in Ville Platte, testified on this issue:
“Q. All right. So its not something that just manifests itself by strong physical exertion one particular day?
A. No, No, it wouldn’t be caused by working hard. Aortic stenosis is not caused by work.
Q. Now, aortic stenosis, the causes, that’s something that develops over a period of time?
A. Right.”
* * * * * #
“Q. * * * Doctor, you also testified that you had no doubt that this condition pre-existed December 15, 1978, by some long period of time?
A. Right.
Q. And you also testified, didn’t you, Doctor, its your opinion work had nothing to do with the cause of this condition?
A. Right.”
Dr. Donald Gremillion, the internal medicine specialist in Opelousas testified:
“Q. I want to ask you this, Doctor: He is disabled now due to a heart pathology which is known as aortic stenosis? Is that correct?
A. Yes, sir.
Q. An aortic stenosis is not caused by hard work?
A. No, sir. The etiology is not due to hard — to labor. Not aortic stenosis, no, sir.
Q. Doctor, isn’t it also fair to say that aortic stenosis progresses in what the doctors sometimes call ‘clinical silence’ for many years?
A. Yes, sir.
Q. In other words, the man has it and he doesn’t know it, and its a condition which progressively gets worse, and then some symptom is going to occur to tell him that he has it?
A. That’s right. Yes, sir.
Q. That symptom could occur whether you are working or not working?
A. That’s right.
Q. When that symptom does occur, then in all probability, the aortic stenosis has gotten to the stage where the man had best take care of himself and not perform hard labor?
A. That’s my opinion, sir.”
From the above quoted testimony of all three of the expert medical witnesses in this case, we feel there is no question the pre-existing aortic valve stenosis was not caused by physical labor performed by plaintiff on or before the day of the accident.
The next question is whether the syncope (fainting) on December 15, 1978, caused the pre-existing aortic stenosis to become worse than it was before that date. Here again, all three doctors testified it did not. Dr. Helm stated:
“Q. Do you think that because of this incident, and we can call it an accident if you want to, on December 15, 1978, that that condition was worsened or aggravated?
A. No.
Q. I think that you have committed yourself in writing to the fact that *547 it was not aggravated by this condition — this incident.
A. That’s correct. I mean the aortic stenosis didn’t get any worse because of these symptoms.”
Dr. Fontenot testified on this issue:
“Q. But my question is, merely because he had the hard work, which resulted in the syncope or fainting spell, did not aggravate permanently the aortic stenosis?
A. No, its an agressive (progressive ?) disease which is gradually worsened with time.
Q. In other words, Doctor, this man in the past may not have realized it, may have had dizziness . . .
A. Right.
Q. ... or dyspnea or shortness of breath, or any of the other common symptoms . . .
A. Right.
Q. ... of aortic stenosis, and may not have even realized it?
A. That’s right.
Q. This was just a dramatic symptom of the condition?
A. That is right.”
Dr. Gremillion also testified on this issue:
“Q. The question I want to ask you is whether or not that fainting aggravated the aortic stenosis?
A. Oh, no, sir.”
Thus, all three of the doctors testified plaintiff’s pre-existing aortic valve disease was not aggravated or made worse by the fainting spell on December 15, 1978. This fainting spell was only a symptom which made the doctors aware of the pre-existing heart disease and that it had progressed to the point that it was disabling.
In a supplemental brief filed in this court after oral argument, counsel for plaintiff, in an attempt to show there is some expert medical testimony in the record that the fainting spell worsened plaintiff’s pre-exist-ing physical condition, quotes the following by Dr. Helm under redirect examination by plaintiff:
“Q, Alright. Well, is there a change — if he is not having heart pain and he obviously wasn’t if he had been working regularly, you know, like the history does show and prove, then that means he must have been getting enough blood to the heart as compared to now where he is having this heart pain and he must not be getting enough blood to the heart. Would that not be a change?
A. Well, it’s a change. Yes, it’s a change. He has — I think his symptoms have markedly increased and there has been a change in his symptoms.
Q. Since the accident on December 15th?
A. There is a change in his symptoma-tology and he has worsened since December 15th.”
• We have carefully studied the entire testimony by Dr. Helm. The excerpt quoted by plaintiff in his supplemental brief does not change nor conflict with the opinion expressed by Dr. Helm several times that the fainting spell of December 15, 1978 did not worsen plaintiff’s pre-existing heart disease. All that Dr. Helm is saying in the portion of his testimony quoted by plaintiff is that since the December 15, 1978 fainting spell, plaintiff’s symptoms have increased markedly. In other portions of his testimony, Dr. Helm explained that once the calcification of the leaflets of the aortic valve has progressed to the point that there is a fainting spell from insufficient blood flow to the brain, the disease then usually progresses rapidly. Also, blood supply will probably become insufficient for the coronary arteries, resulting in angina (chest pain). Finally, death will usually result within five years unless the defective valve is replaced.
Counsel for plaintiff also argues the question of causal connection between the accident and the disability is an issue of fact as to which the trial judge should not be reversed on appeal unless he was clearly wrong. In the present case, we conclude *548 the trial judge was clearly wrong in finding as a fact that the presumption of causal connection between the accident and the disability was not rebutted by the unanimous highly qualified expert medical opinion to the contrary.
Malone and Johnson, Workers’ Compensation, 2nd Edition, Section 257, at pages 564^-565, makes the following observation regarding appellate review:
“Especially on the issue of whether there was an accident event are appellate courts slow to reverse the decision of the trial court. The occurrence of an accident is usually proven by oral testimony, and the credibility of the witnesses is often the all-important factor. The trial judge, who heard the witnesses, and has had an opportunity to observe them, is often in a better position to weigh credibility than an appellate court reading from the record.
Expert medical opinion, however, may readily be weighed by recourse to the record, and since medical testimony is an important factor in determining causal relation between accident and disability, the appellate court is somewhat more ready to reach an independent decision on this question than on the question of the occurrence of an accident event, though reversals are still infrequent.”
In the present case, we conclude the trial judge was manifestly erroneous in finding a causal relation between the accident and the disability. As stated above, all of the expert medical opinion, including that of the highly qualified treating physician specialist, Dr. Helm, a specialist in internal medicine, Dr. Gremillion, and plaintiff’s own physician at his home in Ville Platte, Dr. Fontenot, is clear and unequivocal that there was no causal relation between the fainting spell on December 15, 1978, and plaintiff’s present disability.
For the reasons assigned, the judgment appealed is reversed and set aside. It now ordered, adjudged, and decreed that plaintiff’s suit be dismissed and that he pay all costs in the trial and appellate courts.
REVERSED AND RENDERED
DOMENGEAUX and LABORDE, JJ., dissent and assign reasons.